**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

SONYA L L. STEIN,             )    CASE NO.   1:10-cv-2915
                             )
          Plaintiff,         )
                             )
    v.                    )    MAGISTRATE JUDGE VECCHIARELLI
                             )
MICHAEL J. ASTRUE,       )
Commissioner of Social Security,  )
                             )    MEMORANDUM OF OPINION
          Defendant.      )

This case is before the magistrate judge by consent.  Plaintiff, Sonya L. Stein

("Stein"), challenges the final decision of the Commissioner of Social Security, Michael

J. Astrue ("Commissioner"), denying Stein's application for a period of Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i),

and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act

("Act"), 42 U.S.C. §§ 423 and 1381(a).   This court has jurisdiction pursuant to 42 U.S.C.

§ 405(g).

For the reasons set forth below, the court AFFIRMS the decision of the

Commissioner.

I.  Procedural History

Stein filed an application for DIB and SSI in December 2006, alleging disability as

of October 13, 2005.  She later amended her application to assert an onset date of

March 22, 2007.  Stein's application was denied initially and upon reconsideration.
Stein timely requested an administrative hearing.

Administrative Law Judge Penny Loucas ("ALJ") held a hearing on August 11,
2009.  Stein, represented by counsel, testified on her own behalf at the hearing.  Robert
Paternik testified as a vocational expert ("VE").  The ALJ issued a decision on October
27, 2009, in which she determined that Stein is not disabled.  Stein requested a review
of the ALJ's decision by the Appeals Council.  When the Appeals Council declined
further review on November 3, 2009, the ALJ's decision became the final decision of the
Commissioner.

Stein filed an appeal to this court on December 23, 2010.  Stein alleges that the
ALJ erred because (1) the ALJ failed to assign appropriate weight to the opinion of
Stein's treating providers; and (2) the VE's testimony was not credible.  The
Commissioner denies that the ALJ erred.

## II.  Evidence

### A.    Personal and Vocational Evidence

Stein was born on December 10, 1962 and was 46 years old on the date of the
ALJ's decision.  She has a GED.  Her past relevant work includes horticultural worker,
waitress, deli clerk, and short order cook.  She has a history of drug and alcohol abuse
but testified that she no longer uses drugs,drinks, or smokes.  She lives with and is
supported by her prospective daughter-in-law, Jennifer.

### B.    Medical Evidence

Between January 25, 2006 and November 8, 2006, Stein received chiropractic
treatment from McClelland Chiropractic.  Transcript ("Tr."), pp. 273-85.  She complained

2

of pain in the small of her back, radiating as a shooting or burning into her leg and foot. Stein told the intake interviewer that her onset date was January 25, 2006, when she fell on the ice at home.  Her range of motion was limited at L5-S1, although she was able to walk normally and climb stairs.  The attending chiropractor diagnosed sacroiliac subluxation, sprain or strain, and obesity due to low activity level.  He engaged in chiropractic manipulation once a month, from which Stein received modest relief.  The chiropractor recommended walking.  He did not recommend an assistive device.

On March 14, 2007, Martin Fritzhand, M.D., examined Stein at the request of the Bureau of Disability Determination ("the bureau").  Tr. at 229-35.  Stein complained of lower back pain.  She told Dr. Fritzhand that she had fallen in September 2005, "but it wasn't that bad," and she did not see a physician.  Tr. at 233.  She fell a second time in February 2006, and her lower back pain worsened since then.  She said that she had received no medical care for her back since that time.  She did not allege that the pain radiated into her legs, although she said that sometimes her lower limbs went numb and burned.  She took Tylenol for the pain and did not use a heating pad, bedboard, or lumbosacral support.  Stein reported smoking two packs of cigarettes a day and having a phlemy cough for ten years.  She also reported that she could walk no more than a half block before becoming short of breath.  Stein measured five feet, six inches tall and weighed 283 pounds.  She had slight difficulty bending at the waist to 85 degrees, and extension of the spine was diminished by five degrees.  Stein had no bowel or bladder complaints.  Gait was normal.  Leg raising, leg length, and hip flexion were normal. Range of motion was generally good.  There was no sign of atrophy, muscle weakness, or pedal edema, and sensory responses were normal to pinpricks and light touch.  Dr.

3

Fritzhand diagnosed morbid obesity, chronic low back pain, dyspnea secondary to tobacco abuse, and sinus tachycardia.  An x-ray of the lumbar spine revealed no abnormalities.

On March 22, 2007, John Reece, Ph.D., a psychologist, completed a consultative clinical evaluation of Stein at the request of the bureau.  Tr. at 237-41.  Stein told Dr. Reece that she was the youngest of 11 children, and she reported growing up alternately with her mother and father until age 8, when she was placed in a foster home.  She also reported that when she was a student, she had been a bully.  Stein said that she had been unruly and a runaway as a child and had trouble in school because she skipped classes.  Stein left school in the eleventh grade because she became pregnant.  According to Stein, her father was physically abusive and had alcohol problems, and some of her siblings have had legal problems.  Stein was arrested 10-15 times for aggravated assault and battery, possession of drugs, and sale of drugs.  She did not report any jail or prison time.  Stein left her first husband because he abused her, and her current husband has been in prison for the past 11 years.  Her 25-year old son is also in prison.

Stein reported drinking 12 beers and smoking two to three packs of cigarettes daily.  Stein had never been hospitalized for mental health reasons, had never had drug or alcohol counseling,[1] and had never received psychological testing.  Stein complained of "bad nerves" and had been prescribed medication for mental health problems, although she was not currently taking them.  When asked why she thought she was

---

[1]  Stein did, however, report that she had received substance abuse outpatient treatment in Pickens County, South Carolina for 2½ years.

4

disabled, Stein said, "My back is real bad; I don't comprehend well; and a lot of bad stuff in my life."  Tr. at 237.  Stein said that she was not currently working but that, when she did work, she got along with other workers, was able to follow instructions, and dealt with stress at work by working harder.  She had never received vocational rehabilitation services.

Stein was casually dressed and cooperative and did not exhibit any eccentricities of manner or impulsive behaviors.  There was no apparent flight of ideas or poverty of speech, although she slurred her speech.  Eye contact was inconsistent.  Stein's affect was constricted but appropriately varied, although she tended toward mild to moderate dysphoria or anxiety.  Stein reported that she was depressed because her son was in legal trouble.  She also reported nervousness, anxiety around people, and problems getting to sleep and staying asleep.  According to Stein, she medicated with alcohol because of childhood and spousal abuse, and that abuse caused nightmares and flashbacks.  She said that she was easily irritated or angered by minor irritants.  Dr. Reece did not detect any evidence of hallucinations, delusions, paranoia, obsessive-compulsive behaviors, somatic concerns, or dissociative experiences.  Stein was alert, responsive, and oriented to person, place, and time.  She exhibited no confusion or memory problems, and Dr. Reece assessed her cognitive functioning as low average.  Insight and judgment were fair, and Dr. Reece opined that Stein was able to make plans, deal with the demands of daily living, and handle her own funds.

Stein said that she had no source of income and lived alone in a trailer.  She spent most of the time in bed watching television.  She also socialized with her future daughter-in-law, Jennifer.  She cooked for herself and could bathe without help, drive a

5

car, make change, and read and write letters without difficulty.  She reported that she could not clean or shop.

Dr. Reece diagnosed Stein as suffering from alcohol abuse, an unspecified depressive disorder, and posttraumatic stress disorder.  He assigned her a Global Assessment of Functioning ("GAF") of 50.[2]  He opined that Stein was moderately impaired in her ability to relate to others; had low cognitive functioning but no comprehension or memory problems; was not impaired in her ability to maintain attention, concentration, persistence, and pace in performing simple tasks; displayed no problems with concentration or persistence; was extremely impaired in her ability to withstand the stress and pressures associated with daily work activity; and could manage money without difficulty.  Dr. Reece also opined that Stein was likely to use alcohol to cope with stress.  In reaching these conclusions, Dr. Reece did not administer any formal psychological testing and relied on Stein's self-reports.

In April 2007, state agency psychologist R. Kevin Goeke, Ph.D., completed a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment evaluating Stein's mental condition.  Tr. at 243-60.  Dr. Goeke opined that Stein suffered from an unspecified depressive disorder, an anxiety disorder characterizsed by recurrent and intrusive recollections of a traumatic experience, and a substance addiction disorder marked by alcohol abuse.  He found that Goeke had moderate limitations in her restriction of activities of daily living; difficulties in maintaining social functioning; and difficulties in maintaining concentration, persistence, or pace.  He also

---

[2]  A GAF of 41 to 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning.

found that Stein was moderately limited in her abilities to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.

Dr. Goeke described Stein as alleging disability due to physical ailments and depression and currently claiming an inability to work due to back problems.  He found her to be in the low average intelligence range, with memory grossly intact, and able to understand and remember simple work instructions.  According to Dr. Goeke, Stein reported that she could watch television, care for dogs, cook, and budget her money. She did not exhibit flight of ideas, was oriented, and could recall three of three words after a delay, repeat six digits forward and backward, and interpret one of three proverbs.  She had average basic arithmetic skills.  However, Dr. Goeke found that Stein exhibited inconsistent eye contact, constricted affect, and shaking due to anxiety. He also found that Stein had suicidal ideation without intent; low energy, and a poor ability to abstract similarities.  Dr. Goeke opined that Stein could sustain concentration and persistence in completing simple, routine work duties.

7

Dr. Goeke also described Stein as having occasional contact with neighbors and more regular contact with Jennifer, who helped with household chores.  She behaved appropriately to the staff at the Social Security Agency, the bureau, and to the staff of the consulting examiner.  Dr. Goeke believed, however, that Stein's adaptability was limited by her depressive symptoms.  He opined that she was capable of carrying out tasks whose duties are relatively static with changes that can readily be explained, that did not require independent prioritization or more than daily planning, or that required more than occasional interactions as long as they did not involve conflict or persuading others to follows demands.  In sum, her mental residual functional capacity was assessed as limiting her to low social demand settings without strict production quotas or time pressures.  Finally, Dr. Goeke found Stein's allegations regarding the nature of her psychological symptoms to be credible but not her allegations regarding the severity of those symptoms.

In July 2007, state agency psychiatrist Tonnie Hoyle, Psy.D., affirmed Dr. Goeke's assessment.  Dr. Hoyle denied Stein's claims that her condition was worsening, as this was not supported by the record.  Dr. Hoyle also rejected Dr. Reece's opinion that Stein was not able to withstand pressure and stress as inconsistent with the record and observation.

Dimitri Teague, M.D. completed a Physical Residual Functional Capacity Assessment of Stein on April 18, 2007.  Tr. at 261-68.  He found that Stein could lift 50 pounds occasionally and 25 pounds frequently, could stand or walk six hours in an eight-hour workday, could sit with normal breaks for six hours in an eight-hour workday, and was unlimited in her capacity to push or pull.  He also found that Stein could never

8

climb ladders, ropes, or scaffolds and could only occasionally balance, stoop, kneel, crouch, or crawl.  He found no other physical limitations.  Dr. Teague noted that Stein alleged constant sharp, non-radiating back pain resulting from falls in 2005 and 2006. He found her to be neurologically intact, although with absent Achilles tendon reflexes bilaterally.  Her strength was normal, and she exhibited no spasm, muscle atrophy, abnormalities of gait or joints, or nerve damage.  Range of motion was normal except in her dorsolumbar spine, and she had slight difficulty bending forward at the waist.  An x-ray of Stein's lumbar spine was normal.  Dr. Teague found her symptoms to be only partially credible, as the alleged severity of her symptoms was not consistent with the record.  On August 21, 2007, Teresita Cruz, M.D., affirmed Dr. Teague's assessment.

On June 27, 2007, Herbert Segnitz, M.D. Stein's treating physician, completed a medical assessment of Stein at the request of the bureau.  Tr. at 270-71.  Dr. Segnitz diagnosed Stein as suffering from traumatic thoracic and lumbar injury resulting in thoracic pain and lumbar radicular pain, depression and anxiety, and hypertension, all aggravated by poverty.  Dr. Segnitz opined that Stein's back condition and secondary obesity severely limited her activities of daily living and reported that Stein exhibited limited lumbar flexion and extension and limited range of motion in her left hip.  There was no corroborating testing or second opinion because Stein was reluctant to pursue medical care due to a poor understanding of the medical system.  Dr. Stegnitz added that Stein needed imaging and electrodiagnostic studies to rule out structural spinal problems that would prevent physical therapy and a "more forceful use of herself" in pursuing employment.  Tr. at 270.  He noted that Stein was currently taking Lotrel, Soma, Lortab, and Valium, and he stated that he did not know of any compliance

9

problems that interfered with treatment.  He opined that Stein's back problems severely

limited even mild manual activities for the past 16 months and that she could not bend,

push, carry, walk, sit, or stand at the risk of complicating her current disabilities.  He

also described her as unsophisticated but having the ability to related adequately ,

perform personal activities of daily living, function independently, and manage

resources.

On September 12, 2007, an MRI was taken of Stein's thoracic spine.  Tr. at 289.

The results were mostly normal, with some areas of increased signal most likely

representing small vertebral hemangiomas or plate degenerative signal.  There was no

stenosis, herniation, epidural mass, or cyst.   An MRI of the lumbar and sacral spine

taken at the same time showed a large deposit of epidural fat along the lumbar and

sacral spine, with consequent narrowing of the thecal sac particularly noticeable at L5

and S1.

Stein visited James Fleming, Jr., M.D., for a consultative examination on October

18, 2007.  Tr. at 307-09.  Stein reported that her low back pain travels bilaterally into the

lower extremities, is more severe on the left side, can reach 10 on a 10-point scal, and

is 90% back pain and 10% leg pain.  She denied bowel or bladder symptoms, weakness

in the lower limbs, or abnormalities of gait.  Dr. Fleming reported that Stein was them

taking Lortab, Valium, Cozaar, and Lasix.  Stein said that she was smoking two packs a

day and drinking a six pack a week.  An examination revealed good general health.

Gait was normal except for some difficulty with heel to toe walking, and Dr. Fleming

detected decreased forward flexion and extension of the lumbar spine and decreased

reflex response at the quadriceps and Achilles tendons.  Otherwise, range of motion,

strength, reflexes, pulses, degree of tension, and absence of pain upon motion were normal.  There was no atrophy.

Dr. Fleming noted Stein's recent MRI results and diagnosed lumbar stenosis at L-5/S-1, perhaps secondary to epidural lipomatosis.  After discussion with Stein, he recommended physical therapy, an anti-inflammatory, and consultation for pain management for consideration of epidural steroid injections or other therapies.

Samuel Lettvin, M.D., treated Stein between October 24, 2007 and April 2009. Tr. at 376-77, 388-89, 396-97, 402-03, 410-11, and 481-84.  Stein reported continuing back pain.  She also reported that she had gone to a pain management doctor and neurosurgeon and that "[o]ne of them spoke of her in very derogatory terms and was very condescending to her."  Tr. at 483.  Dr. Senitz advised her not to see those doctors again, which Dr. Lettvin found to be appropriate.  Dr. Lettvin diagnosed Stein as suffering from a probable bipolar affective disorder, an unspecified personality disorder, a panic disorder with agoraphobia, and possible obstructive sleep apnea.  She was then taking Diazepam and Abilify.  In October 2007, Dr. Lettvin found Stein to be in generally good spirits, although her mood was somewhat labile and easily tearful.  Insight and judgment were somewhat limited, speech was normal in rate but hyperverbal, and associations were loose with tangentiality and circumstantiality.  There was no evidence of psychosis or lethality.  In March 2008, Stein was somewhat more optimistic but had a somewhat labile affect and cried very easily because of her son's health problems. Speech was normal in rate but with mild looseness of associations and tangentiality. Insight and judgment were limited, but she was able to laugh and joke.  In April 2008, Dr. Lettvin found Stein to be mildly dysphoric and slightly anxious with somewhat labile

11

and tearful affect.  Nevertheless, she was pleasant and responded appropriately to questions.  She denied suicidal or homicidal ideation but admitted auditory hallucinations that she attempted to ignore.  Insight and judgment were fairly limited. Stein was particularly distraught in May 2008 because her son was turned down for parole and was diagnosed as suffering from cancer.  Stein's affect was labile and tearful, and her hygiene was deficient.  Speech was normal in rate, but associations were loose and tangential.  In August 2008, Stein visited Dr. Lettvin in the company of her case manager.  Stein was stressed because of the failure of her son's first surgery and the unresolved outcome of his second.  Stein's case manager reported that Stein had been doing better until these events.  Affect was still labile and tearful, but grooming was neat, and Stein was able to laugh and joke on occasion.  In October 2008, Stein appeared to be doing well on her current doses of Abilify and Diazepam.  By April 2009, however, Stein reported that she was not taking her Abilify because she was having trouble getting it.  Dr. Lettvin noted that her symptoms seemed much worse.  Stein reported that she was being evicted and would have to move to Mansfield and live with her mother.  Dr. Lettvin diagnosed probable bipolar affective disorder, a personality disorder, a panic disorder with agoraphobia, and possible obstructive sleep apnea.  He gave Stein a supply of Abilify and referred her to mental health facilities near Mansfield.

Dr. Fleming referred Stein to Dr. Kurt Gronbach, an anaesthesiologist and specialist in pain relief, who saw Stein on November 5, 2007.  Tr. at 321-24.  Dr. Gronbach reported to Dr. Fleming that he diagnosed Stein as suffering from lumbar degenerative disc disease, lumbar lipomatosis, tobacco abuse, obesity, and depression and poor sleep secondary to severe deconditioning.  He recommended a trial of

epidural lumbar steroids to give Stein some relief for a limited time to allow her to make lifestyle changes and re-condition herself.  He also noted that Stein was resistant to lifestyle changes and seemed to be looking for solutions involving medications.

On November 29, 2007, Dr. Lettvin completed a Mental Capacity Assessment after examining Stein at the request of Stein's attorney.  Tr. at 340-46.  He opined that Stein was moderately limited in her abilities to understand and remember very short, simple instructions; carry out very simple, short instructions; work in coordination with or proximity to others without being distracted by them; and ask simple questions or request assistance.  He also opined that Stein was markedly limited in her abilities to remember locations and work-like procedures, understand and remember detailed instructions, maintain attention and concentration for extended periods, maintain an ordinary routine without special supervision, make simple work- related decisions, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independent of others.  Dr. Lettvin also opined that Stein was extremely limited in her abilities to carry out detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and work week without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods; and maintain socially appropriate behavior and adhere to basic standards of

13

neatness and cleanliness.  He added that Stein was unemployable, and that her limitations are expected to last for 12 months or more.  Dr. Lettvin also noted that his report may be an underestimate of the severity of Stein's limitations because he had only seen Stein once.  Dr. Lettvin found Stein to have poor grooming and hygiene and tangential and circumstantial speech.  He also found her to be cooperative but anxious and with impaired judgment and mildly impaired recent memory.  He noted that no cognitive testing of Stein had been done.

Dr. Lettvin completed a Mental Impairment Questionnaire about Stein's condition on February 1, 2008.  347-53.  He diagnosed Stein as suffering from depression, anxiety, hypertension, obesity, and probably obstructive sleep apnea.  He assigned her a GAF of 46.  Dr. Lettvin listed her current medications as being Abilify, Cozaar, Lasix, Diazepam, and Lortab.  He reported that Stein's symptoms include pervasive loss of interest in almost all activities; decreased energy; thoughts of suicide but without intent; feelings of guilt or worthlessness; generalized persistent anxiety; mood disturbance; difficulty concentrating; hyperactivity; motor tension; flight of ideas; manic syndrome; deeply ingrained, maladaptive patterns of behavior; pathological dependence; loosening of association; persistent disturbances of mood or affect; pressures of speech; easy distractability; sleep disturbance; decreased need for sleep; recurrent severe panic attacks; and bipolar syndrome.  He described her reliability as questionable and her insight/judgment as poor.  His prognosis was fair, noting that Stein had been under-treated in the past.  Dr. Lettvin opined that Stein was limited but satisfactory in her abilities to remember work-like procedures; understand and remember very short, simple instructions; and ask simple questions and request assistance.  He further

14

opined that Stein was seriously limited but not precluded in her abilities to work in coordination with or proximity to others without being unduly distracted, make simple work-related decisions, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and be aware of normal hazards and take appropriate precautions.  He also opined that Stein was unable to meet competitive standards in her abilities to maintain attention for a two hour segment, to maintain regular attendance and be punctual within customary tolerances, sustain an ordinary routine without special supervision, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, respond appropriately to changes in a routine work setting, and deal with normal work stress, understand and remember detailed instructions, set realistic goals or make plans independently of others, to deal with stress of semiskilled and skilled work, adhere to basic standards and neatness and cleanliness, travel in an unfamiliar place, and use public transportation.  He also noted that she had no useful ability to carry out detailed instructions.  Dr. Lettvin reported that Ms. Stein was seriously limited, but not precluded in the areas of interacting appropriately with the general public and maintaining socially appropriate behavior.  He suspected borderline intellectual functioning.  Finally, Dr. Lettvin opined that Stein was markedly limited with regard to activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace.  He found that Stein had suffered one or two episodes of decompensation within a 12 month period, each of at least two weeks' duration.

15

Dr. Lettvin also found that Stein had a current history of one or more years' inability to function outside a highly supportive living arrangement, an anxiety related disorder, and a complete inability to function independently outside the area of one's home.  He added that on average Stein's impairments would cause her to be absent from work more than four days per month.  He also noted that her impairments could be expected to last at least 12 months and that her impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation.  He noted that Stein had not undergone formal testing.

Stein received mental health counseling from the Scioto Valley Mental Health Center between September 19, 2007 and February 22, 2009.  Tr. at 312-20, 375-95, 397-401, 415-18, 461-79.  Stein reported back pain, hypertension, and edema upon admission and stated that her problems included her son's imprisonment and a dislike of crowds.  The intake nurse also evaluated her as suffering from a severe depressive disorder, bipolar disorder, and alcohol abuse.  She described a chaotic upbringing, trouble with the law, a family history of alcohol abuse, and financial dependence upon a mother who is emotionally abusive.  She was assigned to counselor Tina M. Viney ("Viney").  At first, Stein received one-on-one counseling and became attached to Viney. She resented a switch to group therapy in the first part of 2008.

Most of Stein's expressed concerns during counsel related to her son's failure to receive probation and health problems.  Stein also discussed the inability of doctors to treat her medical conditions, Jennifer's health problems, the sickness and death of her cat, and problems dealing with her mother.  Generally, Stein's affect was normal in group discussions, and she was able to participate by speaking and by supporting

16

others.  In the middle of 2008, Stein reported increased back pain and expressed

frustration at her inability to work and at the reduced efficacy of her medication.

On June 3, 2008, Viney completed a Mental Impairment Questionnaire assessing

Stein's mental condition.  Tr. at 427-32.  Viney stated that she was seeing Stein once a

week and that Stein only missed appointments when she had doctor's appointments.

Viney described Stein's symptoms as including generalized persistent anxiety, mood

disturbance, pathologically inappropriate suspiciousness or hostility, emotional

withdrawal or isolation, sleep disturbance, and persistent irrational fear of a specific

object or activity.  Viney opined that Stein was seriously limited but not precluded in her

ability to understand and remember very short and simple instructions, carry out very

short simple instructions, maintain attention for a two hour segment, sustain an ordinary

routine without special supervision, ask simple questions or request assistance, and be

aware of normal hazards and take appropriate precautions.  Viney also opined that

Stein was unable to meet competitive standards in her abilities to remember work-like

procedures, maintain regular attendance, work in coordination with or proximity to

others, make simple work-related decisions, complete a normal workday and workweek

without interruption, perform at a consistent pace without an unreasonable number and

length of rest periods, accept instructions and respond appropriately to criticism, get

along with co-workers or peers, respond appropriately to changes in a routine work

setting, deal with normal work stress, interact appropriately with the general public,

maintain socially appropriate behavior, adhere to basic standards of neatness and

cleanliness, travel in an unfamiliar place, and use public transportation.  Viney further

opined that Stein was seriously limited but not precluded in her abilities to understand

17

and remember detailed instructions, carry out detailed instructions, set realistic goals or make plans independently of others, and deal with stress of semiskilled and skilled work.  Finally, Viney opined that Stein's impairments would cause her to be absent from work more than four days per month.  Dr. Lettvin affirmed Viney's opinions on September 18, 2008.

On July 11, 2008, Stein visited Jeffrey Lobel, M.D., upon referral from Dr. Fleming to determine whether the mass of fatty tissue along Stein's lower spine warranted surgery.  Tr. at 361-62.  Dr. Lobel concluded that removal of the tissue would probably not offer significant relief from the pain she was experiencing and that surgery involved a distinct risk that her pain might be worse after an operation.  He recommended a second opinion regarding the matter.

On December 2, 2009, vocational expert Barry Brown ("Brown") opined that there are no unskilled jobs which would permit an employee to be off task more than 1.5 hours per day.  Tr. at 223.  According  to Brown, this would not be tolerated by any employer because full-time unskilled, competitive work is 40 hours per week, 8 hours per day.  Brown also opined that an employee who would likely be off task 20% of the time would not be able to work as a cashier, surveillance system monitor, or electronic assembly inspector because none of these jobs would permit an employee to be off task for 90 minutes or more per day.  He also noted that a Cashier II job is defined as a light job and demands that the employee lift up to 20 pounds from the floor occasionally.

*C.  Hearing Testimony*

Stein testified at the hearing that she filed applications for benefits because she injured her back and had trouble dealing with stress.  Tr. at 36.  The she gained weight

after she hurt her back and hurt her back a second time when she got into a fight.  Tr. at 36-37.  She testified that after she was injured she was not able to stand or walk for any length of time and has not worked since then.  Tr. at 37.  Stein did not receive any unemployment benefits or worker's compensation, and she was able to live because her mother financially supported her since 2005.  Tr. at 38.

Stein testified she had gotten into trouble over a series of assaults and for selling marijuana.  Tr. at 44.  She also testified that she had drunk nine beers daily for 15 years but stopped in 2008 because she wanted to live until her son was released from prison.  Tr. at 44-45.  She also said that she stopped smoking pot a long time ago.  Tr. at 45.

According to Stein, the day before the hearing she spent about six or seven hours out of the house driving to visit her mother and sister about 15 miles away.  Tr. at 46-47.  Stein testified that she lives with Jennifer, who helps her with tasks that require bending, such as pulling down her pants and also helps cook and clean.  Tr. at 47.  Stein also said that she could lift a gallon of milk but could not use the stairs to the basement in her house.  Tr. at 48.  She listed her medications as Abilify, Ambien, and Valium.  Tr. at 49.

The ALJ asked the VE to assume an individual with Stein's age, work experience, and education, with an ability to do light work but a restriction that she sit no more than six hours a day, stand no more than two hours, and walk no more than two hours.  The VE was to further assume postural limitations prohibiting ladders. heights, or climbing; only occasional bending; and no lifting of more than 20 pounds.  The VE testified that such an individual could not perform Stein's past relevant work.  Tr. at 62.  According to the VE, such an individual could perform the work of parking lot attendant,

a mail clerk, and assembler, all jobs existing in significant numbers in the regional and national economy.

The ALJ then asked the VE to assume the same individual except limited to lifting no more than ten pounds, no bending and lifting of anything more than five pounds from the floor, and a moderately limited ability to withstand stress and pressure. The additional limitation on stress and pressure would result in the hypothetical individual being off-task 20% of the time.  The VE testified that such an individual could not perform any of the jobs that he had said the previous hypothetical individual could perform.  According to the VE, the person assumed by the second hypothetical could perform the job designated as Cashier II by the Dictionary of Occupational Titles.  That person could also perform other cashier jobs and the jobs of surveillance system monitor and touch-up screener.  When the ALJ changed the second hypothetical to assume an individual who was extremely limited in the ability to withstand stress and pressure, the VE said that there were no available jobs for such a person because that person would be off-task one-third of the time, which no employer would tolerate.  Tr. at 64-68.

Finally, the ALJ asked the VE to assume an individual with Stein's age, work experience, and education, with an ability to do light work but a restriction that she sit no more than six hours a day, stand no more than two hours, and walk no more than two hours.  The ALJ asked the VE to further assume that this individual could not meet competitive standards in her ability to maintain regular attendance and be punctual, complete a normal workday or workweek without interference from psychologically-based symptoms, respond appropriately to changes in work setting, or deal with normal

20

work stress.  The VE testified that such an individual would not be able to do the jobs that the VE had already described.  When the ALJ asked if an individual who missed four days of work a month would be employable, the VE responded that they would be employable only for a month.

### III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second,  the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the

21

claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

IV.  Summary of Commissioner's Decision

In determining that Stein was not disabled, the ALJ made the following relevant findings:

3.  The claimant has the following severe impairments: chronic back pain secondary to epidural lipomatosis and a depressive disorder.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work . . . except she cannot lift more than 10 pounds occasionally; she cannot bend or lift anything weighing more than five pounds from the floor level; she cannot climb ladders or work around heights; she is limited to simple, unskilled work.  She is likely to be off-task up to 20% of the time due to interference from psychological symptoms.

6.  The claimant is unable to perform any past relevant work.

7.  The claimant was born on December 10, 1962 and was 42 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.

8.  The claimant has at least a high school education and is able to communicate in English.

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

22

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from October 13, 2005 through the date of this decision.

Tr. at 14-31.

## V.  Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Commissioner of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

Stein alleges that the ALJ erred because (1) the ALJ failed to give appropriate weight to the opinions of treating providers, Viney and Dr. Lettvin, and (2) the ALJ improperly relied on the VE's testimony.

*A.     Whether the ALJ erred in failing to give the opinions of Viney and Dr. Lettvin controlling weight*

The opinion of treating physicians should be given greater weight than those of

23

physicians hired by the Commissioner.  *Lashley v. Secretary of Health and Human Servs.,* 708 F.2d 1048 (6th Cir. 1983).  This is true, however, only when the treating physician's opinion is based on sufficient objective medical data and is not contradicted by other evidence in the record.  20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 & n.7 (6th Cir. 1991); *Sizemore v. Secretary of Health and Human Services*, 865 F.2d 709, 711-12 (6th Cir. 1988).  Where there is insufficient objective data supporting the opinion and there is no explanation of a nexus between the conclusion of disability and physical findings, the factfinder may choose to disregard the treating physician's opinion.  *Landsaw v. Secretary of Health and Human Servs.,* 803 F.2d 211, 212 (6th Cir. 1986).

"[W]here the expert medical opinions expressed by doctors who have examined and treated an applicant state that he is disabled from engaging in any substantial gainful activity, a contrary finding by a hearing examiner is in the realm of speculation and reversible error in the absence of countervailing substantial evidence." *Walston v. Gardner*, 381 F.2d 580, 585 (6th Cir. 1967).  Moreover, the ALJ must provide "good reasons" for the weight assigned to treating physicians.  Failure to do so does not constitute harmless error and requires remand. *Wilson v. Commissioner of Social Security*, 378, F.3d, 541, 544 (6th. Cir. 2004).

1.  *Whether the ALJ erred in failing ailing to give the opinions of Viney controlling weight*

The ALJ reviewed the medical evidence in the record thoroughly and in detail.  In rejecting the opinions of Viney regarding Stein's degree of limitation, the ALJ determined that Viney did not possess an Ohio medical license, nursing license,

counselor's license, social worker's license, or marriage license.  Moreover, her credentials for offering a medical opinion or for treating Stein appeared nowhere in the record.  The ALJ concluded, therefore, that Viney was not an "acceptable medical source" nor a "treating source" within the meaning of 20 CFR §§ 404.1502, 404.1513(a), 404.1527, 416.902, and 416.927(d).  For this reason, the ALJ did not give Viney's opinion's controlling weight.

Stein responds that Viney is, indeed, a treating source because she has been Stein's counselor.   Stein concedes that although Viney is not the sort of treating source whose opinion is entitled to controlling weight, she is an "acceptable medical source" pursuant to 20 CFR 404.1513.  According to Stein, SSR 06-03p provides that "acceptable medical source" opinions must be considered and not rejected just because they are not entitled to controlling weight.  Consequently, the ALJ erred in refusing to accept Viney's opinion merely because she was not a "treating source."

Stein's argument is not well taken.  An "acceptable medical source" is defined at 20 CFR 404.1513(a)(1)-(5) and 20 CFR 416.913(a)(1)-(5).  Viney is not an "acceptable medical source" within the meaning of those provisions.  Rather, Viney served Stein as a psychological therapist of unknown qualifications.  As such, she was an "other source," as described at 20 CFR 404.1513(d) and 20 CFR 416.913(d).  Those sections specify that the Commissioner "*may* . . . use evidence from other sources to show the severity or your impairment(s) and how it affects your ability to work . . . ."  *Id.* (emphasis added). Thus, the regulations allowed the ALJ to consider Viney's opinions, but they did not require her to do so.  In any event, the ALJ did explain that she discounted Viney's opinions because they were inconsistent with the notes of the medication nurse and

Viney's own notes.  *See* tr. at 25.  For these reasons, the ALJ did not err in not accepting Viney's opinions regarding Stein's limitations.

> 2.    *Whether the ALJ erred in failing ailing to give the opinions of Dr. Lettvin controlling weight*

In rejecting the opinions of Dr. Lettvin, the ALJ first summarized his impression of Stein's condition and progress as documented in Dr. Lettvin's notes and other documents in the record:

> [T]he claimant had stressors in her life that caused episodes of tearful expressions of concern for her son's well being.  The record also shows that she had relatively immediate, positive and longlasting response to a variety of treatment modalities which included talking about it with her case manager, attending group heapy, attending counseling sessions with a psychiatrist and taking medication.  As noted in Dr. Lettvin's records, within two weeks of prescribing Abilify to her, the claimant had observable improvement in her concentration, had increased her activity level around the house, had more "good days" and had an improvement in sleep pattern.  Thereafter, the claimant's demeanor was consistently reported by the medication nurse and the psychiatrist as good or pleasant; her spirits were elevated; she responded appropriately to questions and to stressors in her life; and she displayed a "future oriented" outlook.  She had no psychosis, no hallucinations, no suicidal thoughts, and no thoughts of harming others.  Documentation also indicates a reduction in alleged panic attacks--although the October 2008 note is the first time that Dr. Lettvin mentions panic attacks in his notes.

> So long as the claimant was taking her medication, she did well.  When she did not take her medication, she had an increase in her symptomology.  More crying spells, more mood swings and a disturbance in her sleep pattern.  Overall, this evidence supports the conclusion that the claimant's mental impairments were responsive to treatment and[,] thus, do not preclude her from sustaining employment.

Tr. at 27.

The ALJ then specifically rejected Dr. Lettvin's opinions regarding Stein's limitations as expressed in three documents.  The first document was the Mental Functional Capacity Assessment signed by Dr. Lettvin on November 29, 2007.  Tr. at

26

341-46.  The ALJ rejected the opinions in this assessment because Dr. Lettvin completed it after seeing Stein only once, because it was based largely on Stein's self-reports, and because Dr. Lettvin had not had an opportunity to evaluate Stein's response to medications when he completed the report.  In addition, the ALJ noted that Stein "did note the limitations in his opinions were based on the fact that he had only seen her once."  Tr. at 27.  What the ALJ neglected to report was that Stein had written, "*This may be an understatement of her condition.*  I've only seen her once."  Tr. at 341 (emphasis added).

The second document expressing Dr. Lettvin's opinions and rejected by the ALJ was the Mental Impairment Questionnaire signed by Dr. Lettvin on February 1, 2008.  Tr. at 348-563.  The ALJ gave three reasons for rejecting the opinions in this document.  First, according to the ALJ, Dr. Lettvin did not seem to have completed the document, even though he signed it.  The ALJ based this conclusion on the observations that (1) the form was addressed to Viney, rather than Dr. Levin; (2) the blank labeled "Frequency and length of contact" was filled in "Monthly so far, I hour for initial eval. and about 30 min. for f/up," which describes Stein's contacts with Viney rather than Dr. Levin; (3) a handwritten note on the form in response to a question noted, "? = I'm uncertain," which the ALJ concluded was more characteristic of someone other than a physician; and (4) the handwriting did not look like Dr. Lettvin's.  From these facts, the ALJ concluded that Dr. Lettvin "perfunctorily" signed the questionnaire.  Tr. at 28.

The ALJ's second reason for rejecting the questionnaire is that it was drafted shortly after Stein had started her Abilify medication and it was too early for Dr. Lettvin to observe the benefits that Stein would receive from that medication.

27

The ALJ's third reason for rejection the opinions in the questionnaire was that the ALJ regarded the "extreme functional limitations" described in the questionnaire as "entirely inconsistent with the rest of the medical record including Dr. Lettvin's office notes which indicate that the claimant responded favorably to the prescribed medication and the counseling sessions."  Tr. at 28.

The third document in which Dr. Lettvin assessed Stein's limitations and which the ALJ rejected was the Mental Impairment Questionnaire completed and signed by Viney on June 3, 2008 and signed by Dr. Lettvin on September 18, 2008.  Tr. at 427-32. The ALJ gave this document little credence for the same reasons she rejected the Mental Impairment Questionnaire signed by Dr. Lettvin on February 1, 2008.

In addition to these reasons for rejecting the documents, the ALJ wrote as follows:

> [W]hile the undersigned gives consideration to the information [Dr. Levin] has documented during his counseling sessions with the claimant, the undersigned does not give controlling weight to the opinions expressed in or inferred in [the above documents] for the reasons cited above. In addition, Dr. Lettvin repeatedly copied a differential diagnosis of panic disorder with agoraphobia v. social phobia, yet he failed to ultimately rule out one or the other.  The evidence in the claimant's record is inconsistent with a conclusion that the claimant suffers from any significant social impairment that would preclude her from employment as evidence by the following events:  she consistently attended her group therapy sessions and was an active participant; she attended her counseling sessions with Tina Viney and Dr. Littven and had no problems expressing herself and her feelings; she reported to the medication nurse when expected; she defended her right to the continued receipt of food stamps at the Ohio Jobs and Family Services Center; she drank beer daily with her neighbors and the day before th hearing, was out visiting with relatives for about seven hours.  Dr. Lettvin documented only once a statement by the claimant regarding panic attacks, and on that occasion it was to report a decline in their occurrence as well as in their severity, which occurred subsequent to her being on medication.  No objective tests were ever performed; no MMP; or any other test to assess the reliability of her statements of the extent of her symptoms.

28

Tr. at 28.

The ALJ's reasons for rejecting the three documents in which Dr. Lettvin expressed opinions regarding Stein's functional limitations have serious deficiencies. First, the ALJ cherry-picked Dr. Lettvin's comments regarding his doubts about the opinions expressed in the Mental Impairment Questionnaire.  The ALJ noted Dr. Lettvin's doubt, but failed to note that Dr. Lettvin thought that the actual result might be in favor of greater limitations, not lesser ones.  Second, the ALJ's attempt at handwriting analysis goes beyond her area of expertise and is rejected as a reason for discounting Dr. Lettvin's opinions.[3]  Third, even if Lettvin signed a form that he did not complete, that does not mean that the opinions are not his.  For this reason, the ALJ's use of "perfunctory" in describing Dr. Lettvin's signing of the February 1, 2008 questionnaire was entirely gratuitous.  Fourth, the ALJ's incorporation of the reasons for rejecting the February 1, 2008 questionnaire into the reasons for rejecting the June 3, 2008 questionnaire incorporates too much.  One of the reasons for rejecting the February 1, 2008 questionnaire was that Stein had been taking Abilify for only two weeks when Dr. Lettvin completed the earlier questionnaire and could not have seen the benefits Stein would eventually receive from that medication.  But when the June 3, 2008 questionnaire was completed, Stein had been taking Abilify for more than four months. The ALJ's reasoning regarding the unmaterialized benefits of Abilify as undercutting the

---

[3]  The handwriting on June 3, 2008 questionnaire seems considerably different from the handwriting on the Mental Functional Capacity Assessment signed by Dr. Lettvin on November 29, 2007.  While the court has no greater expertise than the ALJ in the matter of handwriting analysis, it seems at least possible that the ALJ was wrong regarding the authorship of the Mental Functional Capacity Assessment.

opinions in the February 1, 2008 questionnaire is inapplicable to the opinions in the later questionnaire.

Nevertheless, even after discounting the shortcomings in the ALJ's reasoning, the ALJ provides sufficient, valid reasons for rejecting the opinions of Dr. Lettvin regarding Stein's functional limitations as expressed in the three documents described above.  The Mental Functional Capacity Assessment was completed after seeing Stein only once, was based largely on Stein's self-reports, and was completed before Dr. Lettvin had an opportunity to evaluate Stein's response to medications; the February 1, 2008 questionnaire was completed before Dr. Lettvin had an opportunity to evaluate Stein's response to medications and described limitations inconsistent with the record; and the June 3, 2008 questionnaire described limitations inconsistent with the record. In addition, the ALJ cited problems with Dr. Lettvin's reporting generally and his reliance on self-report while avoiding objective tests.  These reasons constitute substantial evidence in support of the ALJ's rejection of Dr. Lettvin's opinions regarding Stein's functional limitations.

For the reasons given above, Stein's contention that the ALJ erred in failing to give the opinions of Viney and Dr. Lettvin controlling weight is not well-taken.

B.    *Whether the ALJ improperly relied on the VE's testimony*

Stein also contends that the ALJ improperly relief on the testimony of the VE because the VE's testimony was unreasonable.  In support of her assertion, Stein cites the document signed by Brown, a vocational expert, who asserts that anyone with Stein's qualifications who was off task 20% of the time would not be employable.  The Commissioner responds that Brown's opinions are not admissible in this court and that

the ALJ was entitled to rely on the testimony of the VE.

During the hearing, the ALJ asked the VE to assume an individual with Stein's age, work experience, and education, with an ability to do light work but a restriction that she sit no more than six hours a day, stand no more than two hours, walk no more than two hours, and lift no more than ten pounds.  The VE was to further assume postural limitations prohibiting bending and lifting of anything more than five pounds from the floor, and a limited ability to withstand stress and pressure which would result in the hypothetical individual being off-task 20% of the time.  According to the VE, the person assumed by this hypothetical could perform various cashier jobs and the jobs of surveillance system monitor and touch-up screener.  When the ALJ changed the hypothetical to assume an individual who was extremely limited in the ability to withstand stress and pressure, the VE said that there were no available jobs for such a person because that person would be off-task one-third of the time, which no employer would tolerate.

When Stein appealed to the Appeals Council the ALJ's finding of "no disability," she added to the record the signed opinion of Brown that anyone with Stein's qualifications who would be off task 20% of the time would be unemployable.  The Appeals Council declined to review the ALJ's opinion.  Respondent now argues that Brown's opinion should not be considered by this court.

When a claimant provides to the Appeals Council evidence not provided to the ALJ, then the Appeals Council declines to review the claimant's appeal on the merits, a reviewing court may ordinarily consider only the evidence available to the ALJ in reviewing the decision of the Commissioner.  *Cline v. Commissioner*, 96 F.3d 146, 149

31

(6th Cir. 1996); *see also Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993).[4]  Brown's opinions were not added to the record until Stein appealed to the Appeals Council.  The Appeals Council refused further review.  Consequently, this court may not consider Brown's opinions in reviewing the decision of the Commissioner that Stein is not disabled.

Stein also argues that the ALJ should not have relied on the VE's opinion because it was internally inconsistent.  According to Stein, the vocational testified that a person with Stein's qualifications could not be absent more than two times per month.  But, Stein continues, if she were off task 20% of the day, this would mean that she would be off task for 1.6 hours in the workday in addition to breaks.   If that 1.6 hours were multiplied by five days per week, Stein would be off task eight hours per week or the equivalent of four days per month.  Since the VE said that more than two absences per month would make Stein unemployable, opining that Stein is employable if she is off task 20% of the time is contradictory.

This argument, while ingenious, is not well-taken for the simple reason that being off task is not equivalent to being absent.  The VE's opinion was carefully considered, as evidenced by his additional testimony that if someone were off task one-third of the time, that person would be unemployable.  Moreover, "nothing in applicable Social Security regulations requires the administrative law judge to conduct his or her own

---

[4]  As the Commissioner points out, the court could remand the case pursuant to sentence six of 42 U.S.C. § 405(g) for the ALJ to consider Brown's evidence.  This requires, however, the claimant to give good reasons for failing to provide the new evidence to the ALJ.  Stein does not provide any reason for failing to present Brown's opinions to the ALJ.  *See Cline*, 96 F.3d at 149.

investigation into the testimony of a vocational expert to determine its accuracy, especially when the claimant fails to bring any [alleged problem] to the attention of the administrative law judge." *Ledford v. Astrue*, 2008 WL 5351015, at *10 (6th Cir. 2008) (citing *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374-75 (6th Cir. 2006)).

In the present case, Stein did not bring the alleged inconsistency in the VE's testimony to the attention of the ALJ at the time of the hearing.  The ALJ, therefore, was not required to investigate the testimony of the VE and was entitled to rely upon it in coming to his decision.  For this reason, Stein's argument that the ALJ improperly relied upon the VE's testimony is not well-taken.

## VII.  Decision

For the reasons set forth above, the court AFFIRMS the decision of the Commissioner and dismisses Stein's complaint with prejudice.

**IT IS SO ORDERED.**


Date:  December 6, 2011                     s/ *Nancy A. Vecchiarelli*
                                            Nancy A. Vecchiarelli
                                            U.S. Magistrate Judge